## REO MOTOR CAR CO. v. GEAR GRINDING MACH. CO.

Nos. 5130, 5131.

Circuit Court of Appeals, Sixth Circuit.

June 13, 1930.

D. Anthony Usina, of New York City (Melville Church, of Washington, D. C., and Whittemore, Hulbert, Whittemore & Belknap, of Detroit, Mich., on the brief), for Gear Grinding Mach. Co.

J. L. Stackpole, of Boston, Mass. (Frederick P. Fish and H. L. Kirkpatrick, both of Boston, Mass., and Walter S. Foster, of Lansing, Mich., on the brief), for Reo Motor Car Co.

Before DENISON, MOORMAN, and HICKENLOOPER, Circuit Judges.

DENISON, Circuit Judge.

Infringement suit by Gear Grinding Company v. Reo Company, based on four patents: Nos. 1,104,589, issued July 21, 1914, to Ward and Taylor, for a gear grinding machine, application filed October 15, 1909; 1,155,532, issued October 5, 1915, to Ward, upon application filed August 13, 1912, for trimming mechanism for grinder wheels of shaft grinding machine; 1,271,495, issued to Ward July 2, 1918, upon application filed August 13, 1912, for method of grinding splined shafts, etc.; and 1,273,016, issued to Ward July 16, 1918, upon application filed May 7, 1918, as a division of the method application, for a splined shaft. The first two patents named were involved in a suit by the same plaintiff against the Studebaker Company, in which case the opinion of this court is reported in 270 F. 934, 935. In the present case, the District Court sustained the first two patents and found that they were infringed by some and not by others of the defendant's practices, and held the method and product patents invalid. Both parties appeal.

The practical and commercial history of the inventions, somewhat recounted in the previous opinion, should be recalled. Early in 1910, the plaintiff, as the assignee of the Ward and Taylor patent in suit, was engaged in grinding gears. It had devised mechanism for grinding the intercontact surfaces of gear teeth, rather than merely cutting them and then perhaps finishing by hand; and the plaintiff had been probably the first to produce gears of precision and of large size cheaply enough for use in machines like automobiles. About then, Ward came to have a concept (generally his although vaguely suggested to him) of adapting this mechanism to the grinding of the bottoms and sides of the grooves of a splined shaft. Whatever inventive character this suggestion had, it clearly was a new thing in the art, as no splined shaft, having these surfaces finished by grinding, had ever been produced commercially.[1] Looking back now it is apparent that even if this grinding could have been done by existing methods and mechanism, it would have been of prohibitive cost, as applied to mass production, and that the desideratum was a machine or method for doing it as rapidly and as nearly automatically, and therefore as cheaply, as possible. The particular problem was presented by the bottom of this groove. A splined shaft is (in the simplest form) a cylinder from the periphery of which spring radial ribs extending for part of the length of the shaft. Thus between each two ribs there is what may be called a groove. The bottom of this is convex throughout its length, a cross section being an arc of a circle struck from the shaft center. A gear centrally pierced for the shaft and having, around this shaft opening, ribs and grooves complementary to those of the splined shaft, slides longitudinally thereon. When their respective ribs and grooves are in engagement, rotary motion is imparted from one to the other; when the gear slides along the shaft past the splines, one lies idle.

The practical difficulty presented to Ward grows from the convex or cylindrical form of this grooved bottom, and from the presence of the obstructions formed by the splines. The customary way of grinding a true surface upon a cylinder, "cylindrical grinding," had been to revolve the cylinder slowly, while held upon its fixed axis, against the flat periphery of a grinding wheel whose axis was parallel to the cylinder axis and which could be adjusted radially to the cylinder. Then the cylinder was slowly fed longitudinally and a perfect cylindrical face was developed. Another method of grinding any regular or irregular convex surface was to use a flat edged or sharp edged grinding wheel and guide the work by the hand of the operator under the effect of the wheel as necessary, and thus gradually develop the desired form. To some extent this could be done automatically, but it was essentially a very skilled operation. Ward's primary thought was that he could grind the bottom of this groove to the desired shape by using a grinding wheel with its axis at right angles

[1] In this statement we ignore some contrary claims to be later discussed and denied.

to the shaft axis and with its edge concaved precisely to fit the desired convexity of the groove bottom and with its width sufficient to cover the entire bottom bearing surface, while the wheel thus formed and operated on the shaft to be ground, was moved longitudinally of the shaft, and if necessary reciprocated longitudinally for the necessary number of passes. This was primarily a thought of general method rather than of specific mechanism. To grind such a surface between obstructions by rotary motion of one part and a longitudinal motion as to the other, did not involve nor depend upon the means by which either part should be operated nor upon any other details of construction. A practical difficulty, the solution of which must be embodied in any successful method or machine, came from the tendency of the grinding wheel to wear out of true shape, and the necessity that it must be reformed or trued as frequently as need be, and with precision. If also it was desired to grind the bottom of the groove and sides of the splines during the same pass (as Ward evidently thought would be important to commercial success), there was additional difficulty in maintaining the form of the grinding wheel, particularly at the corners.

Having a general conception of method and mechanism, and having devised what he thought the necessary details, Ward began, in the summer of 1910, to make some splined shafts to fill an order from the Hudson Company. It is his theory that this work, prior to August 13, 1910 (two years before application filed), was experimental. At any rate, successful commercial production was in progress in October, 1910.

As appears from the record in the previous case (incorporated into this record by consent), and from this record, the ground splined shaft, the product of this mechanism and method, was very well received, and has gone into almost universal use in the automobile industry. Many of the leading manufacturers have taken licenses from the plaintiff under this group of patents, or sent their shafts to plaintiff's shops to be ground; many, if not most, of the others are infringing (if the patents are valid as claimed), and have been and are associated in defense of the former case and of this one.

■ The first question presented is as to the effect of the former decision. It was there held that certain claims of the first two patents were valid against the defenses there presented, and that certain machines and organizations constituted an infringement of these claims, and that certain other organizations did not. It appeared in the record in that case, and was fully known to plaintiff, that the defense had been assumed and was carried on in the name of the defendant and for its pro rata benefit by the National Automobile Chamber of Commerce; that this was a voluntary association of automobile manufacturers, one of the purposes of which was to defend, if thought proper, any patent suit brought by an outsider against any member of the association; that in case it was decided to make such defenses by the association in the name of a member—as it had been decided in the Studebaker Case—the association selected counsel and paid all the expenses of the litigation on behalf of the member who was sued; and that to these expenses all members contributed according to an agreed system. It further appears by that record, supplemented by this, that the present defendant, the Reo Company, was then, and is now, a member of the association; that as such, through its authorized agents, it joined in the selection of counsel and the maintenance of the defense of the Studebaker Case; and that it paid its share of all the expenses of that association, including this litigation expense. The fact of this membership and participation by the present defendant in the former case was also then known to plaintiff. Under these facts we have no doubt that the former decree is an adjudication, for and against the present defendant as well as for and against the plaintiff, of every issue there decided, expressly or by necessary implication. Beyer Co. v. Fleischmann (C. C. A. 6) 15 F.(2d) 465, 466; Vapor Co. v. Gold Co. (C. C. A. 2) 7 F.(2d) 284, 287.

It is now alleged that the present defendant, by its practices varying at different times, has infringed the patents of 1909 and 1915, involved in the former litigation. So far as the questions involved are the same as those then actually decided or necessarily involved, that result controls here; so far as the questions are variant and open, we are not satisfied that the District Judge made any error in his treatment or conclusions; and these conclusions are affirmed.

This brings us to the method patent. We think it usually will be true, and here is true, that where there are coincident method, machine and product inventions, the underlying meritorious inventive thought will be found in one of the three, and the other two will be relatively collateral. As is apparent from our consideration in the former case, the perhaps apparently natural thought of grinding to precision and for mass production such ir-

regular shapes as gears, and the like, had never been accepted by the art—probably because of the supposed impossibility of maintaining perfectly enough the complementary grinding surface. The improver must first conceive, in a general way, the method or plan for such grinding, and must then devise means for effectively and sufficiently maintaining the grinding shape. Until this can be done, the conception is not an invention, because it is useless. When, however, the method is reduced to practice so that its utility is demonstrated, the method becomes a patentable invention, as the means also may be; but the merit of the method dominates both means and result. Such, we think, is the case here. In Ward's trimming means application (patent 1,155,532) he persistently endeavored to secure a patent which should cover the successive use of appropriate grinding and trimming mechanism; but he was constantly met by the objection that these mechanisms were not patentable unless they were united in one organized machine. To this he was compelled to yield, probably rightly; the reason was that the invention, in its broader aspect, was not a machine but a method. In the previous litigation, the District Judge inquired very properly why it was, if Ward had made the invention claimed, that he had not secured a method patent; and the reply was that he thought himself entitled to such a patent but had not yet convinced the Patent Office. When the case reached this court, the method patent had been issued, but was not in the record; and we were therefore compelled to dispose of the controversy as it existed upon that record.

Claims 3 and 5 of the method patent are in suit. As to matters of infringement by defendant, there is clearly no difference between them; as to the matter of validity, we see none. Claim 3 is: "The method of producing a shaft, which consists in forming the same of hardened steel, with projecting splines and intermediate grooves between the splines, leaving stock for grinding throughout the splined portion, and grinding with a formed wheel bearing faces on the bottoms of said grooves throughout their length and width, and symmetrically with reference to the axis of the shaft." The defenses are anticipation and lack of invention. As to anticipation, the reliance is chiefly on three things: The Driggs-Seabury use, the American Company use, and (equivalent in effect to anticipation) the pre-application public use by the patentee. In the former suit, the first and third of these uses

were set up as defenses against the machine patent. There is in many, if not all, respects identity of effect between the defenses there and here. There, as here, it is replied that these uses were merely experimental and (except as to the third) abandoned. This reply fits as well the method as the machine, and the former adjudication that these uses were experimental seems to be a complete reply now. As to the Driggs-Seabury use, we are satisfied to leave it in that way without further discussion. The American Company use of the complete method, at a time before August, 1910, is not in this record sufficiently proved. The exhibit shafts which were surely made by the method were not early enough; those clearly proved to be earlier were not certainly made by this method. In our judgment, the prior use by the patentee is clearly the most forceful of the three, and if that defense is not sustained, the others cannot be.

██ Assuming that the question were open, we see that whether this third defense is good depends wholly on the application of the familiar rule that so long as the use by the inventor, or even sales to the public, can fairly be considered experimental and collateral to the development of the invention in its complete form, the bar does not begin to run. We considered this question in Austin v. Buckeye, 13 F.(2d) 697, 698, and in Kerner v. Townsend (D. C.) 27 F.(2d) 599, 604; Id, (C. C. A.) 27 F.(2d) 606, and will not repeat. We think that it, like other invalidating defenses, should be made out clearly and to the point of conviction; and we see no principle, in the precedents or in the policy of the statute, which would require a valuable invention to be lost by permitting the bar to begin to run while the invention, whether of machine or process, is being gradually improved and developed up to the point of ascertaining whether it has real utility. Nor can it rightly be said that a public use of the developing and incomplete invention—incomplete as finally claimed—can nevertheless operate as the public use bar because adding the final element of perfection did not involve invention as compared with the earlier form to which it was added. Whether a claim has patentable invention is not to be tested by comparing with the patentee's earlier, unpublished, progressive steps. Sandy MacGregor v. Vaco (C. C. A. 6) 2 F.(2d) 655, 656.

The record shows that the broad conception, as finally perfected and as formulated in (e. g.) claim 3, occurred to Ward early in

1910; that about April, 1910, attempts were begun to manufacture the shafts accordingly; that these early efforts were not successful; that the development of manufacturing process and mechanism continued during the summer; and that in October—possibly in September—the development was substantially complete. The critical date was August 13. Whatever use there was during all this period was public enough, and it was in connection with current sales of the product; but its embodiment of all the steps of the combination of claim 3 was incomplete, until near the end of the period.

The essential commercial novelty of the idea was that the method would produce the finished shaft, ground to such precision as to be interchangeable with any other in association with any similarly ground gear. Unless it would do this, the method was useless, for the expense of finishing up, by hand operations, imperfectly ground shafts would be commercially prohibitive, and the results would not be properly interchangeable. The outstanding practical difficulty, as stated in the former opinion, was to maintain the relatively sharp corners of the grinding wheel, whether it had the W face or only a concave arc face. Until this could be done, the method was on trial. The evidence is clear that the imperfection of the trimming mechanism, whether in theory or in construction, kept the method on trial until the latter part of the period, and that the product produced and sold earlier had to be finished by hand operations. It was only in September or October that the inventor secured such perfection of adjustment and construction in the trimming mechanism as to demonstrate that his method was a success instead of a failure. Unless he had succeeded in these details of application, the method would have gone into the stock room of oblivion, and Ward's critics, skilled in the art, who had prophesied its failure, would have been justified. Under these circumstances, we must conclude that it does not clearly and satisfactorily appear that the perfected and complete method of claim 3 was in public use before August 13, 1910.

The defense of noninvention, as distinguished from anticipation, is also strongly urged. The old Brown and Sharpe and Navy Yard gauges probably make the sharpest challenge. Plaintiff insists that a gauge, a mere testing shop instrument, which carries no strain and is not a shaft at all, is not in the same nor closely analogous art with a driving gear, intended for heavy work under hard conditions of service. However that may be, in considering these gauges as well as the claimed anticipations, the limitations fairly implicit in the claim must be given reasonable construction and force. The object of the invention is to make, by this method alone, a finished and perfected shaft exactly like 100 or 1000 others. The contemplated grinding is not a polishing or buffing operation, but is for shaping and forming. Distortion by the hardening process is expected, and stock is left for grinding off this distortion. This means a substantial amount of such stock, because the length of the shaft permits twists and bends. To get the perfect result by grinding alone requires that the grinding wheel be "formed" and kept formed. Lacking that, the inevitable wear will destroy the axial symmetry which the claim specifies. The gauges were short, subject to a minimum distortion in hardening, and there was no occasion to leave much stock to be ground off. It is not clear that there was any so left, on both bottom and sides of the parts analogous to the spline grooves; and what grinding there was seems to have been smoothing, not forming; nor is it clear that the entire bearing surface, between the obstructions, was ground by a single wheel fitted and formed therefor, rather than by more gradual steps. The precise size and form were finally attained by filing, lapping, and other hand operations. The workman would cut and try perhaps a score of times. His finished gauge was unique. It is said that a factory often feared to have more than one gauge in use, because two would not be exactly alike. It is a far cry from such slow, expensive, hit and miss work to the process which Ward developed and was the first to use for mass production. Doubtless the words of the claim, read literally and broadly, might describe a method which had been somewhat used in connection with some old gauge manufacture; but this record does not require such a destructive literalness. In so far as these old methods might be thought to answer the general characteristics of the claim, it required vision to see, as Ward did, that he could adopt them to the modern need, and by properly forming his wheel and keeping it in proper radial relation to the shaft axis, could make his grinding do the final shaping; and the claim should be read reasonably to preserve and not to destroy his advance step.

It is urged, as it was before against the trimmer, that the Ward and Taylor patent in suit leaves no room for the method patent. To the distinctions which we pointed out before, we may add that Ward and Taylor

failed to show the use of a longitudinal reciprocating wheel to shape into cylindrical, or any other form, the shaft surface between the teeth. They contemplated clearance and not grinding at this point. Gear teeth are not intended to have their ends ride upon the bottom of the grooves between the teeth in the intermeshing gear.

In determining the question of invention in the method, the Patent Office history has rather unusual force. Applicant's claim of invention was denied by the examiner and upon appeal by the Board. Upon a further appeal to Commissioner Newton in person, this action was reversed. A conclusion so reached upon appeal, and after thorough controversy, is entitled to very substantial respect, and makes the case more emphatically one where the courts are not justified in holding a patent invalid unless the lack of invention is made clear. Though the gauges were not specifically referred to, the grinding art in general was of course familiar to the Patent Office experts, and the office in effect yielded to Ward's claim that his successive trimming and grinding applied in this connection, constituted a new method properly expressed by the claim.

It is suggested also that, since the trimmer patent of 1915 disclosed the method, there is an extension of monopoly and in effect a double patenting by issuing the method patent in 1918. It will be remembered that the applications were filed at the same time and the longer pendency of the method application was the result of the greater persistence shown by the Patent Office in opposition to the grant. This subject of copending applications, involving two aspects of the invention, has been fully and recently discussed by us in the Wirebounds Patents opinion, 37 F.(2d) 830, filed January 25, 1930, and to that discussion we refer.

It is also urged that a conclusion of laches or estoppel, by analogy to the rule of the Splitdorf Case, 264 U. S. 463, 44 S. Ct. 342, 68 L. Ed. 792, may be found in the Patent Office history of the method patent. We cannot agree. There was no laches. True, the method application was held in statu quo for two or three years with only the formal action necessary to keep it alive; but this was during the period while the interference was progressing concerning the machine patent, and an attempt to press the method application would have been improper. There was no estoppel arising (if it might sometimes so arise) from a failure to claim the broader monopoly until after some competitor has put out a device not reached by the earlier claims. From the beginning to the end of these applications, Ward was constantly seeking a claim which would clearly have covered every one of defendant's different practices. Sometimes his breadth of claim was found in the machine application, sometimes in the method case, sometimes in both; but if we,—unnecessarily,—confine our attention to the method case, we find that its claims were not at first, or ever, confined to the grinding of the shaft and the trimming of the wheel by mechanism mounted in one organized unit. The Reo Company's so-called third practice was begun in August, 1916. It was believed to avoid the trimmer patent, because the grinder and the trimmer, while mounted in proper relation on one frame, were in a form not shown in the drawings of the trimmer patent. The District Court has held, and we are approving, that this change did not avoid that patent; but the use of it certainly was within the original claims of the method patent. The defendant's fourth practice, and the only one to be affected by the injunction sought on the method patent, was adopted in 1921, three years after that patent. The record does not show any adoption by others until after the method patent issued; but this is immaterial, because defendant's fourth practice, as well as the third, was within the scope of the method claims which were continually sought during the whole progress of the application. True, the language in claim 3 was later revised by adopting a different descriptive viewpoint, but the revision did not operate to bring within its scope any of defendant's practices which had not been within the scope of the former claims. The controversy with the Patent Office in its earlier part was as to methods of expression and as to the supposed impropriety of including in one patent a method of trimming the wheel and a method of grinding the shaft. Later the controversy was as to the existence of invention in the method when compared with the earlier art. The fact clearly is that Ward from the beginning constantly claimed that he was entitled to a patent covering the idea which is expressed by claim 3 of the method patent. He yielded to the limitations of the trimmer patent under compulsion, but at the same time he was, in the method patent, insisting upon his broader right. This subject of laches and estoppel we have also discussed at length in the Wirebounds Case, and again make reference to that opinion.

There remains for consideration the product patent. Its validity is forcefully challenged on the ground that if it is not con-

fined to the product made by the patented method it is not patentably distinguishable from the older gauges, nor from other products familiar in the art. We see no object in deciding this perhaps difficult question. No suggestion has yet been made that any competitor desires to, or successfully can, manufacture the device of the product patent except by the patented method. Whether competitors infringe one or both of these two patents does not seem to be of any practical importance. As to all infringement since the date of the method patent, the royalty thereon, whether upon the established or the reasonable basis, would necessarily cover the product patent as well, and as we said in the former accounting appeal [Gear Grinding Machine Co. v. Studebaker Corp. (C. C. A.) 4 F.(2d) 510, 511], one royalty upon the use of machine or method seems appropriate compensation for breach of plaintiff's monopoly, no matter upon how many bases that monopoly rests.

Accordingly, the decrees below are affirmed as to patents 1,104,589 and 1,155,-532. As to patent 1,273,016 the bill will be dismissed without prejudice. As to patent 1,271,495 there will be the usual interlocutory decree for plaintiff. The plaintiff will recover the costs of this court and such costs in the court below as that court may direct.